UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------
MARTIN J. WALSH, Secretary of Labor,
United States Department of Labor,

                    Plaintiff,

            v.

UNITED BEHAVIORAL HEALTH and
UNITEDHEALTHCARE INSURANCE
COMPANY,

                    Defendants.
-------------------------------------------------------------

**COMPLAINT FOR ERISA VIOLATIONS**

Civil Action No. 21-cv-4519

## PRELIMINARY STATEMENT

Plaintiff, Martin J. Walsh, Secretary of Labor, United States Department of Labor (the "Secretary"), alleges as follows:

1. The Secretary brings this action to enjoin and remedy violations of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Defendants United Behavioral Health ("UBH") and UnitedHealthcare Insurance Company ("UHIC") administer employee health plans under ERISA's jurisdiction.

2. The Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), incorporated as ERISA § 712, 29 U.S.C. § 1185a, prohibits ERISA-covered health plans from imposing treatment limitations on mental health and substance use disorder benefits ("mental health benefits") that are more restrictive than the treatment limitations they impose on medical and surgical (also called "medical/surgical") benefits. This action primarily concerns two separate practices by UBH and UHIC (collectively, "United") that violated MHPAEA.

3. First, United set policies and procedures and adjudicated claims for benefits in such a way that they caused the ERISA-covered health plans they administered to systematically

reimburse participants and beneficiaries for out-of-network mental health services in a more restrictive manner than United reimbursed them for out-of-network medical and surgical services.

4. Second, United imposed a concurrent review program to limit benefits for outpatient mental health benefits in a way that was broader and more aggressive than the programs in place for analogous medical and surgical benefits.

5. In doing so, United violated MHPAEA and also breached its fiduciary duties of loyalty and prudence, as well as its fiduciary duty to administer the plans in accordance with their terms only insofar as those terms are consistent with ERISA. ERISA §§ 404(a)(1)(A), (B), & (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), & (D).

6. As a result of United's violations, many participants and beneficiaries did not receive the mental health benefits to which they were entitled under their ERISA-covered health plans.

7. Accordingly, the Secretary brings the following claims for relief under ERISA §§ 502(a)(2) and (a)(5), 29 U.S.C. §§ 1132(a)(2) & (a)(5).

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and general federal question jurisdiction, 28 U.S.C. § 1331.

9. Venue with respect to this action lies in the United States District Court for the Eastern District of New York, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because, during the relevant period, United administered ERISA-covered health plans within this District, and many of the breaches described herein took place in this District.

## PARTIES

10. Plaintiff the Secretary is vested with authority under ERISA §§ 502(a)(2) and (5), 29 U.S.C. § 1132(a)(2) & (5), to enforce Title I of ERISA by, among other things, filing and prosecuting claims against fiduciaries who breach their duties under Title I of ERISA.

11. Defendant UBH provides mental health services to ERISA-covered health plans ("Client Plans"), including managing access to providers of mental health services and products for the participants and beneficiaries of these plans and designing benefits packages for them.

12. The Client Plans, which are not parties to this lawsuit, were welfare plans established by employers to provide health benefits to their employees pursuant to ERISA § 3(1), 29 U.S.C. § 1002(1).

13. At times relevant to this action, UBH was a fiduciary to Client Plans under ERISA § 3(21)(a)(iii), 29 U.S.C. § 1002(21)(a)(iii), because, in implementing a reimbursement reduction on behalf of ERISA-covered plans and causing those plans to reduce the amounts paid to participants and beneficiaries on claims, it exercised discretionary authority or discretionary responsibility in the administration of the ERISA-covered plans for which it managed mental health benefits.

14. At times relevant to this action, UBH was also a fiduciary to Client Plans under ERISA § 3(21)(a)(iii), 29 U.S.C. § 1002(21)(a)(iii), because, in implementing an outlier management program that caused ERISA-covered plans to deny claims for mental health benefits, UBH exercised discretionary authority or discretionary responsibility in the administration of the ERISA-covered plans for which it managed mental health benefits.

15. Defendant UHIC provides services to Client Plans, including claims processing and adjudication.

16. At times relevant to this action, UHIC was a named fiduciary to Client Plans under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), by the terms of the Client Plans' documents.

17. At times relevant to this action, UHIC was also a functional fiduciary to Client Plans under ERISA § 3(21)(a)(iii), 29 U.S.C. § 1002(21)(a)(iii), because, as explained in Client Plans' plan documents, UHIC had exclusive authority and sole and absolute discretion to interpret and to apply the rules of Client Plan and determine claims for Plan benefits and because, in processing claims for mental health benefits for the Client Plans, UHIC exercised discretionary authority or discretionary responsibility in the administration of the Client Plans.

18. UBH and UHIC are both subsidiaries of United Healthcare Group Incorporated ("UHG"), which is not a party to this lawsuit.

## GENERAL ALLEGATIONS

19. At all relevant times, and since at least from 2013 until to present, UBH has designed and managed mental health benefits for Client Plans.

20. For the fully-insured Client Plans -- that is, those Plans for which United and its affiliates are responsible for paying claims -- UBH is responsible for and executes plan design and management of mental health benefits.

21. For self-funded Client Plans -- that is, those Plans that, themselves, pay claims -- UBH made recommendations and Client Plans accepted UBH's recommendations respecting plan design and management.

22. For self-funded Client Plans, UBH also reviewed and monitored claims data to track Plans' compliance with MHPAEA.

23. At all relevant times, and since at least 2013 to present, UHIC has served as claims administrator for Client Plans serviced by UBH.

24. UHIC has exclusive authority and sole discretion to interpret and apply the rules of Client Plans and to adjudicate claims for mental health benefits.

25. UHIC relies on the policies set by UBH to adjudicate claims for mental health benefits on behalf of Client Plans.

26. For fully-insured Client Plans, UHIC was responsible for paying claims. Therefore, United and UHG were adversely impacted by higher claims payments.

27. For self-funded Client Plans, United and UHG marketed their fee-based services based on projected costs. Because higher claims payments were less attractive to plan sponsors, United and UHG's ability to attract and retain business was adversely impacted by higher claims payments.

## ERISA VIOLATIONS

**Out-of-Network Reimbursement Rate Reduction**

28. UBH and United Healthcare ("UHC") -- UBH's counterpart for medical/surgical benefits, also a subsidiary of UHG, and, like UHG, not a party to this lawsuit -- have established networks of providers that have agreed to accept their set rates as full payment for treatment and services, and not to seek additional reimbursement from participants and beneficiaries of Client Plans.

29. When participants and beneficiaries of Client Plans visit out-of-network providers, they generally incur out-of-pocket costs and they may demand reimbursements from the Client Plans, subject to terms and rate limits established by UBH and UHC.

30. To set these limits for mental health treatments, UBH started with a third party rate set by Medicare or by an independent vendor such as Fair Health or Viant.

31. UHC used similar methodologies to set baseline medical and surgical reimbursement rates.

32. However, UBH and UHC differed in the reductions that they applied to mental health reimbursement rates as opposed to medical and surgical rates.

33. Across the board, UBH reduced reimbursement rates for psychologists by 25% and for master's level counselors by 35% as compared to the reimbursement rates UBH set for physicians providing the same mental health services.

34. By contrast, for medical and surgical providers, UHC reduced reimbursement rates for licensure in only limited circumstances, such as assistant surgeon services.

35. Client Plans adopted UBH's and UHC's rates, including the reimbursement rate reduction policy.

36. UHIC subsequently used these rates to process out-of-network claims by participants and beneficiaries of these Client Plans.

37. Thus, if a participant in a Client Plan saw an out-of-network non-physician provider for mental health treatment, the amount that they could get back from that Client Plan would be systemically reduced by United compared to if that participant instead saw a physician provider for the same services.

38. By contrast, if a participant in a Client Plan saw a non-physician provider for medical/surgical treatment, the amount that they would get back from the Client Plan would generally not be reduced by United or UHC as compared to physician providers.

39. For example, if a participant in a Client Plan visited an out-of-network psychologist on this District for a 45-minute psychotherapy session, UBH may have set the baseline reimbursement rate for that service based on the Medicare rate of $106.02. However, UBH would

have then reduced the reimbursement rate by 25%, to $79.51, because the provider was a psychologist and not a psychiatrist.

40. Thus, if the psychologist billed $110.00 for the service, the participant would be obligated to pay the difference, $30.49, out-of-pocket. On the other hand, if the participant had gone to a psychiatrist and been charged the same amount for the same services, the participant would have been entitled to $106.02 and would have been obligated to pay only $3.98 out-of-pocket.

41. United and UHC did not choose to apply the reductions based on any consistent, articulable factors, and so they were not comparable.

42. Until 2016, this reimbursement reduction practice was hidden from participants and beneficiaries. Client Plan documents described the reimbursement of providers as being at "70% of the [reasonable and customary] charge" or at "70% of the [c]overed [e]xpense," while making no mention of reimbursement rate reductions.

43. United subsequently amended the Client Plan documents to disclose the reimbursement rate reduction policy.

44. Through such use of the reimbursement rate reduction policy, United decreased the mental health benefits that Client Plans paid, which had the effect, directly or indirectly, of monetarily benefitting United and Client Plans at the expense of participants and beneficiaries.

**Concurrent Review**

45. Another of the services that UBH performed for Client Plans was outlier management, a sort of concurrent review used to flag unusually high-use participants and beneficiaries, as well as high-cost practices, for additional scrutiny.

46. One tool that UBH used for outlier management was "ALERT," which used over 50 proprietary algorithms to identify what UBH considered unusual treatment patterns (e.g., high numbers of visits) in mental health care and, in many cases, to deny further coverage.

47. For example, nine of the algorithms used by UBH as part of the ALERT outlier management program could lead to denials of outpatient services.

48. ALERT's outlier management was applied to all psychotherapy visits.

49. Four of the algorithms used by UBH as part of the ALERT outlier management program identified outliers based solely on frequency of visits.

50. For example, the UBH "high utilization" ALERT algorithms were triggered after 21 mental health visits by a participant or beneficiary in a six-month period.

51. When a case triggered one of these ALERT algorithms, this resulted in outreach by a "UBH Care Advocate," a licensed behavioral health professional.

52. The UBH Care Advocate would reach out to the provider to discuss the case and treatment plan.

53. Where the UBH Care Advocate determined that the level of care and intensity did not meet medical necessity guidelines, and the UBH Care Advocate and the provider did not agree on an adjustment to the participant or beneficiary's treatment plan, the UBH Care Advocate referred the case to a doctoral-level "UBH Peer Reviewer."

54. When referred, the UBH Peer Reviewer would discuss the case with the provider and often ask the provider for additional information.

55. Using this information, the participant or beneficiary's records, and UBH's medical necessity guidelines, the UBH Peer Reviewer then made a coverage decision, which could lead to

an adverse benefit decision, in which case UBH would cause the Client Plan to stop providing benefits.

56. In contrast to UBH's broad application of ALERT to all outpatient mental health benefits, UHC used outlier management for a very select set of medical and surgical services. These were limited to some subset of therapy visits that included physical therapy visits, occupational therapy visits, and chiropractic therapy visits.

57. However, UHC did not apply outlier management to many other recurring medical and surgical services, such as speech therapy and home health care.

58. United and UHC did not apply outlier management based on consistent factors. Specifically, United used non-comparable data sets in applying outlier management to mental health benefits from those that United and UHC used in applying outlier management to medical and surgical benefits.

59. Through such use of outlier management, United decreased the mental health benefits that Client Plans paid, which had the effect, directly or indirectly, of monetarily benefitting United and Client Plans at the expense of participants and beneficiaries.

**Deficient Disclosures**

60. UBH prepared a single document entitled "Mental Health Parity and Addiction Equity Act Non Quantitative Treatment Limitations - Answers to Key Questions" (the "NQTL Summary Document"), which purported to be an accurate and "user-friendly" disclosure about their nonquantitative treatment limitations -- that is, limits on benefits that are not expressed numerically.

61. Throughout the relevant period, UBH made the NQTL Summary Document available to Client Plans for participants and beneficiaries who requested information on United's NQTLs.

62. However, the NQTL Summary Document did not provide details on reimbursement rate reduction or the use of outlier management, including ALERT. It also did not provide sufficient disclosure to participants who request individualized information about how an NQTL was applied to their benefits.

63. Throughout the relevant period, United did not provide details on the reimbursement rate reduction or the ALERT outlier management program to participants and beneficiaries in Client Plans through any other means.

**Knowing Participation in the Client Plans' Violations**

64. Throughout the relevant period, United knew that the Client Plans adopted United's model plan documents and recommendations, which included United's reimbursement rate reduction and outlier management program.

65. For fully-insured Client Plans, UBH designed all benefits, and the Client Plans did not have the opportunity to customize.

66. For self-funded Client Plans, UBH recommended the structure of benefits, and the Client Plans, which looked to UBH as the expert, adopted those recommendations.

67. UBH also specifically monitored self-funded Client Plan compliance by having each Client Plan complete an "NQTL Tool."

68. UHIC adjudicated claims for the Client Plans, implementing the reimbursement rate reduction and outlier management program.

69. United did not provide sufficient information to Client Plan fiduciaries for them to explain to their participants and beneficiaries the reimbursement rate reduction and outlier management program, including their application to deny claims.

**FIRST CLAIM FOR RELIEF**
**(For Violating MHPAEA in Connection with Reimbursement Rate Reduction)**

70. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary hereby incorporates the allegations of all prior paragraphs.

71. MHPAEA "requires parity between mental health or substance use disorder benefits and medical/surgical benefits with respect to . . . treatment limitations under group health plans." Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. 68240 (Nov. 13, 2013).

72. When a plan provides medical/surgical benefits and mental health benefits, the fiduciaries must ensure that "treatment limitations" applicable to those mental health benefits "are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." ERISA § 712(a)(3)(A)(ii), 29 U.S.C. § 1185a(a)(3)(A)(ii).

73. "Treatment limitations" include limits on benefits based on the frequency of treatment, number of visits, days of coverage, days in a waiting period, or other similar limits on the scope or duration of treatment. 29 C.F.R. § 2590.712(a). Treatment limitations include both "quantitative treatment limitations" ("QTLs"), which are expressed numerically (such as 50 outpatient visits per year), and "nonquantitative treatment limitations" (NQTLs), which otherwise limit the scope or duration of benefits for treatment under a plan or coverage. 29 C.F.R. § 2590.712(a).

74. Fiduciaries must not impose an NQTL with respect to mental health benefits "in any classification unless, under the terms of the plan . . . as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the [NQTL] to [mental health] benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification." 29 C.F.R. § 2590.712(c)(4)(i).

75. At times relevant to this action, Client Plans simultaneously offered both medical/surgical benefits and mental health benefits.

76. By systematically reducing reimbursement rates for mental health benefits for out-of-network non-physician providers compared to physicians, UBH's reimbursement rate reduction policy was an NQTL. 29 C.F.R. § 2590.712(c)(4)(ii)(D).

77. UBH designed the reimbursement rate reduction to apply routinely and broadly to outpatient, out-of-network mental health treatments, but United and UHC did not apply reductions comparably to outpatient, out-of-network medical/surgical benefits.

78. United applied reductions to medical/surgical benefits only rarely, such as non-physicians performing assistant surgeon services, which did not constitute substantially all medical/surgical benefits provided under the Client Plans.

79. The factors used by United in applying the rate reductions for outpatient, out-of-network mental health benefits were not comparable to as the factors that United and UHC used in applying any rate reductions assessed for outpatient, out-of-network medical/surgical benefits.

80. Accordingly, the scope of the reimbursement rate reduction created and implemented by United did not comply with the parity protections of ERISA § 712 (a)(3)(A)(ii), 29 U.S.C. § 1185a(a)(3)(A)(ii), and 29 C.F.R. § 2590.712(c)(4)(i).

81. Through the conduct described above, United has:

    a. Violated the parity protections contained in ERISA § 712(a)(3)(A)(ii), 29 U.S.C. § 1185a(a)(3)(A)(ii), and 29 C.F.R. § 2590.712(c)(4)(i); and

    b. Caused harm to participants and beneficiaries for which they are entitled to relief pursuant to ERISA § 502(a)(5).

## SECOND CLAIM FOR RELIEF
### (For Violating ERISA's Fiduciary Standards in Connection with Reimbursement Rate Reduction)

82. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary hereby incorporates the allegations of all prior paragraphs.

83. Through the conduct described above, United has:

    a. Violated the fiduciary standard of care provisions of ERISA §§ 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), & (D); and

    b. Caused harm to participants and beneficiaries for which they are entitled to relief pursuant to ERISA §§ 409, 502(a)(2), and 502(a)(5), 29 U.S.C. §§ 1109, 1132(a)(2), & 1132(a)(5).

## THIRD CLAIM FOR RELIEF
### (Violation of MHPAEA in Connection with Concurrent Review Program)

84. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary hereby incorporates the allegations of all prior paragraphs.

85. As a concurrent review program that could result in adverse benefit determinations, ALERT was an NQTL. 29 C.F.R. § 2590.712(c)(4)(ii)(A).

86. United applied ALERT's outlier management broadly across outpatient mental health services.

87. United applied outlier management only to certain limited outpatient medical/surgical services, specifically some combination of physical therapy visits, occupational therapy visits, and chiropractic therapy visits, which did not constitute substantially all outpatient medical/surgical benefits provided under the Client Plans.

88. United did not apply outlier management to many outpatient medical and surgical services, such as speech therapy and home health care.

89. The factors used by United in applying outlier management to mental health benefits were not the same as those factors that United and UHC used in applying outlier management for outpatient medical and surgical benefits.

90. Accordingly, the scope of ALERT did not comply with the parity protections of ERISA § 712(a)(3)(A)(ii), 29 U.S.C. § 1185a(a)(3)(A)(ii), and 29 C.F.R. § 2590.712(c)(4)(i).

91. Through the conduct described above, the Plan, United has:

   a. Violated the parity protections contained in ERISA § 712(a)(3)(A)(ii), 29 U.S.C. 1185a(a)(3)(A)(ii), and 29 C.F.R. § 2590.712(c)(4)(i); and

   b. Caused harm to participants and beneficiaries for which they are entitled to relief pursuant to ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).

### FOURTH CLAIM FOR RELIEF
**(Violation of ERISA's Fiduciary Standards in Connection with Concurrent Review Program)**

92. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary hereby incorporates the allegations of all prior paragraphs.

93. Through the conduct described above, United has:

   a. Violated the fiduciary standard of care provisions of ERISA §§ 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), & (D); and

b. Caused harm to participants and beneficiaries for which they are entitled to relief pursuant to ERISA §§ 409, 502(a)(2), and 502(a)(5), 29 U.S.C. §§ 1109, 1132(a)(2), & 1132(a)(5).

## FIFTH CLAIM FOR RELIEF
**(Violations of ERISA's Disclosure Provisions)**

94. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary hereby incorporates the allegations of all prior paragraphs.

95. UBH provided the NQTL Summary Document, which did not provide details on reimbursement rate reduction or ALERT, to Client Plans.

96. United did not provide details on reimbursement rate reduction or ALERT to participants and beneficiaries in Client Plans through other means.

97. Through the conduct described above, United has:

a. Violated the disclosure requirements of ERISA §§ 104(b), 503, and 712(a)(4), 29 U.S.C. § 1024(b), 1133, & 1185a(a)(4); and

b. Caused harm to participants and beneficiaries for which they are entitled to relief pursuant to ERISA §§ 409, 502(a)(2), and 502(a)(5), 29 U.S.C. §§ 1109, 1132(a)(2), & 1132(a)(5).

## SIXTH CLAIM FOR RELIEF
**(Violation of ERISA's Fiduciary Provisions in Connection with Disclosure Violations)**

98. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary hereby incorporates the allegations of all prior paragraphs.

99. Through the conduct described above, United has:

a. Violated the fiduciary standard of care provisions of ERISA §§ 404(a)(1)(B) and (D), 29 U.S.C. § 1104(a)(1)(B), (D); and

b. Caused harm to participants and beneficiaries for which they are entitled to relief pursuant to ERISA §§ 409, 502(a)(2), and 502(a)(5), 29 U.S.C. §§ 1109, 1132(a)(2), & 1132(a)(5).

## SEVENTH CLAIM FOR RELIEF
### (Knowing Participation in Client Plans' Violations)

100. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary hereby incorporates the allegations of all prior paragraphs.

101. By taking these actions, United knew or should have known that its Client Plans and their fiduciaries were violating ERISA, including MHPAEA and the claims regulations, 29 C.F.R. § 2560.503-1, *et seq*.

102. As a result of the conduct as described above, United knowingly participated in violations of ERISA, including MHPAEA and the claims regulations, in violation of ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).

## PRAYER FOR RELIEF

**WHEREFORE**, cause having been shown, the Secretary prays this Court enter an Order, pursuant to ERISA §§ 409(a), 502(a)(3), and 502(a)(5), 29 U.S.C. §§ 1109, 1132(a)(2), & 1132(a)(5):

1. Directing United to re-adjudicate the claims of participants and beneficiaries subjected to the reimbursement rate reduction policy and the ALERT outlier management program in accordance with ERISA, and ordering any approved claims fully paid, and assessing against United the costs of re-adjudication;

2. As an alternative to the relief sought in (1), directing United to be surcharged or ordered to pay mental health benefits that were illegally denied or reduced pursuant to the

reimbursement rate reduction policy or the ALERT outlier management program to participants and beneficiaries;

        3.       Appointing an independent fiduciary to administer the relief granted to participants and beneficiaries, and requiring United to provide all necessary claims and participant information to that independent fiduciary for that purpose;

        4.       Ordering United to ensure the reformation of all Client Plan provisions that violate ERISA;

        5.       Granting pre-judgment interest and lost opportunity costs; and

        6.       Granting such other relief as the Court may deem equitable, just, and proper.

DATED:	August 11, 2021
	New York, New York

        SEEMA NANDA
        Solicitor of Labor

        JEFFREY S. ROGOFF
        Regional Solicitor

        _____/s/_____
        ROSEMARY ALMONTE
        Trial Attorney

        SUZANNE DEMITRIO CAMPBELL
        Senior Trial Attorney

        U.S. Department of Labor
        Office of the Regional Solicitor
        201 Varick Street, Room 983
        New York, NY 10014
        (646) 264-3650
        (646) 264-3660 (fax)
        almonte.rosemary@dol.gov
        campbell.suzanne@dol.gov
        NY-SOL-ECF@dol.gov

        *Attorneys for Plaintiff*
        *Secretary of Labor*